**CHACKEL LAW, PC**
Geoffrey Chackel, OSB #155727
geoff@chackellaw.com
11440 West Bernardo Court, Suite 300
San Diego, California 92127
P: 619.567.2454

Attorney for Plaintiff Charlotte Cramer

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF OREGON

# EUGENE DIVISION

| | |
|---|---|
| CHARLOTTE CRAMER an individual, | **Case No.:** |
| Plaintiff, | **COMPLAINT FOR:** |
| v. | **(1) RELIGIOUS DISCRIMINATION – FAILURE TO ACCOMMODATE;** |
| PEACEHEALTH, a corporation, | **(2) RELIGIOUS DISCRIMINATION— DISPARATE TREATMENT;** |
| Defendant. | **(3) RELIGIOUS DISCRIMINATION— DISPARATE IMPACT;** |
| | **(4) HOSTILE WORK ENVIRONMENT HARASSMENT;** |
| | **(5) UNLAWFUL RETALIATION** |
| | DEMAND FOR JURY TRIAL |

COMES NOW, Plaintiff Charlotte Cramer, through counsel, and files this Complaint for Damages against the above-named Defendant, alleging as follows:

**INTRODUCTION**

1.

This case goes to heart of an individual's fundamental right to freely practice her religion and the corresponding duty of every employer to, *in good faith*, consider and provide reasonable workplace accommodations to employees with sincerely held religious beliefs. As set forth below, in 2021 Defendant PeaceHealth Corporation ("Defendant" or "PeaceHealth") embarked on a corporate mission to coerce compliance with its workplace COVID-19 vaccination policy through uniform, deliberate and intentional conduct that belittled, demeaned, ostracized and ultimately terminated employees that asserted a religious objection to the COVID-19 vaccine, including Plaintiff.

2.

PeaceHealth implemented a uniform and draconian policy directed towards religious objectors (like Plaintiff ) not based upon science or legitimate workplace "health and safety" concerns but instead due to internal bias and hostility towards religious objectors who were viewed as irrational and reprehensible individuals that should not be allowed to work in a PeaceHealth facility. Thus, PeaceHealth refused to consider any reasonable accommodations for religious objectors while simultaneously making public efforts to acknowledge medical objections as valid and to offer reasonable accommodate individuals with medical objections. Essentially, PeaceHealth deliberately concocted a policy and plan with a pre-determined outcome for any religious objector to the COVID-19 vaccine: comply or lose your job.

3.

But knowing it would clearly be in violation of existing religious freedom laws, PeaceHealth belatedly chose to cover its tracks by engaging in a sham religious exemption process that gave the outward appearance of "approving" religious exemptions while, in practice, outright denying them by placing Plaintiff on indefinite "unpaid administrative leave" without benefits.

## JURISDICTION, VENUE, AND PARTIES

4.

Venue for this action is proper in the District of Oregon. This court has jurisdiction over the Title VII claims pursuant to 42 USC 2000e-5(f), and the federal question provision of the 28 USC 1331. This court has jurisdiction over the statutory claim under Oregon anti-discrimination laws under the supplemental jurisdiction provisions of 28 USC 1367(a).

5.

Defendant is a corporation with more than 500 employees that does regular, sustained business activity throughout the State of Oregon.

6.

Plaintiff Charlotte Cramer was employed by PeaceHealth Riverbend Medical Center for over twenty-three years as a Registered Nurse in a variety of positions including triage, clinic, bedside and resource. Her last position at PeaceHealth was as a Case Manager.  Ms. Cramer's lifelong dream was to become a nurse, and she was first employed by PeaceHealth in 1998. She had planned to work at PeaceHealth until her retirement. Ms. Cramer received consistently positive reviews, including receiving the Guardian Angel award for the excellent care of a patient with multiple needs. Ms. Cramer obtained the Professional Nurse Advanced Practice

Expert Level, recognizing accomplishments and leadership qualities. She truly cared about her job and community and picked up extra shifts when needed to help out with staff shortages.

7.

Ms. Cramer holds sincere Christian religious beliefs that prohibit her from receiving the COVID vaccine so that she may keep her body—"the Temple of the Holy Spirit" as she told PeaceHealth—pure. She knew that the COVID-19 vaccines available in 2021 contained substances that would damage and violate the purity of her bodily temple and including because the vaccines were all tested prior to release using cell lines from a voluntarily aborted fetus, and believes that use of those vaccines, therefore, would be complicit in the grave evil of abortion, make her body impure, and violate her religious beliefs.

8.

On or about August 12, 2021, and, at Defendant's insistence, again in late September, 2021, Ms. Cramer conveyed all of these concerns about the COVID vaccine to Defendant, and asked for an exemption from the now mandated vaccines, via email directed to the individuals responsible for reviewing religious exemptions. Attached as Exhibit "A" is a true and correct copy of Ms. Cramer's request for a religious exemption.

9.

On August 31, 2021, Defendant's work badge was deactivated and she was not able to return to work. In early to mid-September, 2021, Defendant "approved" her religious exemption but, without any discussions or interaction, also gave the ostensible "accommodation" of being placed on unpaid administrative leave. On or about September 16, 2021, Defendant asked Ms. Cramer to re-submit her religious exemption request using the Oregon Health Authority form

and threatened to revoke her "approved status" if she refused to use this new form. Plaintiff complied and submitted the signed and completed form on September 23, 2021, to the personnel whom Defendant had designated to receive such "religious" objections. PeaceHealth actively communicated to Ms. Cramer that she remained a PeaceHealth employee on unpaid administrative leave from September 1, 2021, through at least April 2023.

10.

Ms. Cramer timely exhausted her administrative remedies through both the Oregon Bureau of Labor and Industries (BOLI) and the U.S. Equal Employment Opportunity Commission (EEOC). On August 15, 2022, Ms. Cramer lodged a formal complaint of discrimination with BOLI which deemed the matter to be "co-filed" with the EEOC which separately acknowledged receipt of Ms. Cramer's complaint and assigned her a case number. On August 8, 2023, the EEOC issued Ms. Cramer a right to sue letter. Ms. Cramer filed her original complaint in this Court on October 10, 2023. The matters alleged in this Complaint arise from precisely the same conduct and occurrences set out in Ms. Cramer's original Complaint.

## GENERAL ALLEGATIONS APPLICABLE TO ALL
## CAUSES OF ACTION

11.

The COVID-19 pandemic manifested in Oregon in late February of 2020, and Ms. Cramer was exposed to the harsh realities of the pandemic on a day-to-day basis.

12.

Despite the circumstances, Ms. Cramer continued to provide an exceptional quality of work for Defendant. Like so many health care workers during the pandemic, she worked to protect the health and safety of colleagues and patients with little thought to their own safety.

She also scrupulously followed hospital regulations to protect against infection, which included the wearing of personal protective equipment (herein, "PPE"), testing, hand-washing and other hygiene protocols, social distancing when possible, and quarantining if necessary.

13.

In fact, from the beginning of the pandemic in February 2020 through August 31, 2021, Ms. Cramer worked for PeaceHealth and had regular and continual forward facing contact with patients and/or other caregivers without incident or indication that they had unwittingly "transmitted" the COVID-19 virus to patients or other caregivers. PeaceHealth never advised she was a "danger" to patients or other caregivers.

14.

In November and December of 2020, PeaceHealth held a series of townhall meetings with all employees addressing the imminent rollout of COVID-19 employee vaccinations, which PeaceHealth promoted as a "historic" effort designed to "end" the pandemic. In fact, PeaceHealth's November 17, 2020, press release announced "ensuring enough people get vaccinated to achieve herd immunity is the defining public health challenge of this generation." Notably, during a December 2020, townhall, PeaceHealth assured its employees if a vaccine is available, PeaceHealth will recommend its use, but vaccination will not be required. After the COVID-19 vaccines became available, by March 1, 2021, PeaceHealth stated that more than 18,000 healthcare workers had been vaccinated.

15.

During the Spring of 2021, to achieve the publicly stated goal of achieving "herd immunity," PeaceHealth implemented workplace tactics and strategies designed to pressure Plaintiff through endless assurances that it was safe and effective and was the only way the

pandemic would ever end, essentially telling Plaintiff's colleagues that she was the reason the pandemic continued.

16.

By July 2021 nearly 80% of PeaceHealth caregivers were fully vaccinated—meaning critical "herd immunity," as PeaceHealth then publicly claimed to be its goal, was being approached and PeaceHealth had still not mandated the COVID-19 vaccine. In fact, from the beginning of the pandemic through July 2021, PeaceHealth made the COVID-19 vaccine optional and only required employees to make a personal declination regardless of the reason. At the end of July 2021, this changed.

17.

By late July 2021, PeaceHealth's approach towards the COVID-19 vaccine and its treatment of religious objectors significantly shifted. Whereas PeaceHealth has previously relied upon peer pressure and shaming to coerce vaccine compliance, PeaceHealth now intentionally ostracized and harassed unvaccinated caregivers such as Plaintiff through the use of "badge stickers" that each vaccinated PeaceHealth employee had to wear indicating they had made the ostensibly heroic and moral decision (as PeaceHealth self-servingly characterizes) to become vaccinated while Ms. Cramer, a religious objector to the vaccines, was forced to work without a badge sticker. This exposed Plaintiff to public ridicule and shame by other staff as a means of retaliation and an effort to coerce compliance. This also had the intended effect of forcing Plaintiff to explain why she was "endangering" others and prolonging the pandemic, which were false narratives PeaceHealth intended to brand its unvaccinated caregivers with in order to force compliance.

18.

 On August 3, 2021, PeaceHealth announced adoption of a formal policy that required all of its Healthcare Workers ("HCWs") to be "Fully Vaccinated" with a COVID-19 vaccine by August 31, 2021 or face discipline up to and including termination (the "Mandatory Vaccine Policy"). PeaceHealth made this announcement knowing the COVID-19 vaccines did not prevent or reduce the risk of infection of COVID-19 and did not prevent or reduce the risk of transmission of COVID-19. In other words, they were not effective for their stated purpose.

19.

 Significantly, PeaceHealth's August 3, 2021, Mandatory Vaccine Policy announcement told employees that getting vaccinated is imperative, a "moral obligation," "an act for the common good" and explicitly stated the *only legitimate objection is due to medical reasons*: "we believe it is imperative for those who are medically able to get a COVID-19 vaccine." *No reference was made to religious exemptions in PeaceHealth's August 3, 2021, announcement.* This showed a general corporate hostility towards individuals with religious objections and had the intended effect of demonizing any religious objector as immoral and reprehensible.

20.

 Likewise, PeaceHealth's August 3, 2021, Mandatory Vaccine Policy *did not provide for a religious exemption*, stating instead the only "qualifying exemption" was a medical exemption. In fact, the words "religious" or "religion" do not appear in that Mandatory Vaccine Policy, and the final deadline for vaccination was set as August 10, 2021, only one week from the Policy's announcement. This was not an oversight, but was intentional.

21.

 PeaceHealth's demonization of Plaintiff as a religious objector did not end there.

Despite clear existing legal authority from both Oregon State and federal sources that mandatory workplace COVID-19 vaccination policies were illegal *unless* they contained legitimate and good faith *exemptions for sincerely held religious beliefs*, PeaceHealth consistently refused to acknowledge the validity (or even the existence) of religious exemptions in its public statements—instead only choosing to acknowledge medical exemptions as a legitimate reason for refusing the vaccine.

22.

For example, after announcing the Mandatory Vaccine Policy on August 3, 2021, Defendant issued its first COVID-19 Vaccine Requirement Policy FAQs (the "Policy FAQs") answering critical questions of its employees. The Policy FAQs contained numerous sections and references all tied *only to medical exemptions*, which were portrayed as valid:

- "Why is PeaceHealth requiring caregivers to get the COVID-19 Vaccine or submit a qualifying medical exemption?"

- "If I DO NOT get vaccinated but DO have an approved medical exemption, how am I impacted?"

- "If I DO NOT get vaccinated and DO NOT have an approved medical exemption, how am I impacted?"

- "What documentation do I need to provide to request a medical exemption?"

- "If I have a medical exemption, doesn't the visibility of the N95 mask violate my right to medical privacy?"

- PeaceHealth's FAQ even acknowledged it could reasonably accommodate *medical exemptions* for its caregivers through (1) masking, (2) physical distancing, (3) potential reassignment to non-patient care areas, and (4) testing.

23.

The above referenced Policy FAQs did not contain any similar FAQs that referenced a "religious exemption" and no reference was made to accommodating *religious objectors* through (1) masking, (2) physical distancing, (3) potential reassignment to non-patient care areas, and (4) testing. This was done as a means to shame, coerce, discourage and discriminate against individuals with religious objections and force compliance in violation of their rights.

24.

The only reference to a religious exemption in the Policy FAQs was relegated to the last question, and chose to ask whether an HCW can submit a religious exemption, to which PeaceHealth was unclear:

> **Can caregivers submit a religious exemption?**
> The new variants of COVID-19 are a public health emergency that pose a critical threat to those unable to be vaccinated. Very few religious denominations explicitly prohibit vaccinations. We believe the common good is a moral imperative that requires those who are medically able to get a COVID-19 vaccine. If a caregiver has a religious objection to getting vaccinated, they should notify their supervisor. In consultation with Human Resources, such situations will be reviewed as to whether we need to and can reasonably accommodate a religious exemption on a case-by-case basis.

25.

PeaceHealth deliberately chose to show hostility and contempt towards Ms. Cramer by marginalizing her as immoral, on the fringe of society, and outside the scope of PeaceHealth's approved religious beliefs. PeaceHealth's FAQ could have provided neutral language stating the requirements for a religious exemption but instead took the opportunity to show hostility towards religious objectors by stating that "very few religious denominations explicitly prohibit vaccinations" (clearly implying the vast majority of acceptable religious denominations allow for vaccination) and that vaccination is a "moral obligation" outright stating that individuals like

Plaintiff who do not get vaccinated are immoral.

26.

This language was grossly unnecessary and had the intent of deeming Plaintiff as being outside of PeaceHealth's corporately designated list of "acceptable" religious beliefs. Even worse, by stating that PeaceHealth believes taking the vaccine is a "moral imperative," it is explicitly designating those that refuse on religious grounds as "immoral" in accordance with its own corporate religious belief system. PeaceHealth made it clear to religious objectors that it wasn't sure whether it even needed to make an accommodation, let alone any accommodation could ever be "reasonable." This is unadulterated hostility directed towards Plaintiff and, by itself, evidences a discriminatory intent as such comments are wholly irrelevant to whether a religious exemption should be granted.

27.

In fact, PeaceHealth's response to one FAQ accidentally admitted its true intent from the beginning: "Nearly 80% of PeaceHealth caregivers are already vaccinated, and we anticipate that number will increase with *this policy requiring vaccination for anyone who is medically able*." From the outset, PeaceHealth's Mandatory Vaccine Policy was going to be implemented against "anyone who is medically able" to take the vaccine—religious objections had already been dismissed as not qualifying for an exemption.

28.

PeaceHealth even included an FAQ entitled "What is PeaceHealth doing to reduce the stigma that can be associated with choosing to not get the vaccine?" The answer was "[a]s a healthcare organization, we advocate for everyone to receive the vaccine (except those who have qualifying medical exemptions)." This communicated to PeaceHealth employees that

PeaceHealth approved of a stigma being placed on unvaccinated religious objectors like the Plaintiff.

29.

Thereafter, knowing that PeaceHealth employees like Plaintiff were already experiencing increased workplace bullying and harassment, PeaceHealth repeatedly informed its employees that "we respect your right to seek a medical exemption" while continually repeating the same demeaning and hostile message (above) to religious objectors that they are being immoral and harming "the common good" by refusing the vaccine. PeaceHealth's intentional and reckless conduct exposed Plaintiff to public ridicule, bullying, harassment and intimidation by vaccinated staff. Plaintiff was mocked and ridiculed by PeaceHealth caregivers with the phrase "yesterday's hero's, tomorrow's unemployed."

30.

Other PeaceHealth employees punished Plaintiff by intentionally searching for a badge sticker and, when they couldn't find one, walked away from her, refused to be in the same vicinity as Plaintiff or even sit in the same room as Plaintiff. The lack of a badge sticker also gave PeaceHealth employees the ability to identify Plaintiff as being unvaccinated and then directly challenge her religious beliefs at work, with doctors pulling nurses into private meetings to scold them about their vaccination status and imply they would no longer work with them unless they became vaccinated.

31.

PeaceHealth employees also posted comments in PeaceHealth employee chat rooms to tell Plaintiff she is "responsible" for the increased COVID rates, is a murderer, is not Christian, is being selfish, and is using "fake" religion to get an exemption. Other PeaceHealth nurses

posted social media comments advising objectors like Plaintiff they would not receive medical

care at PeaceHealth because they are unvaccinated and did not deserve the right to a hospital bed

compared with a vaccinated patient. Another PeaceHealth caregiver employee told religious

objectors, like Plaintiff, if you end up at PeaceHealth's hospital after refusing the vaccine, "rest

assured you will get no sympathy because we are all done with your bullshit." One PeaceHealth

emergency room physician expressed her anger at unvaccinated individuals, calling them

"science deniers" and claiming they want "everyone dead."  Plaintiff became so impacted and

fearful from the hostile work environment that she was forced to wait in her car before each shift

tearful and afraid of the treatment she was about to receive. Despite complaining, PeaceHealth

took no action to protect Plaintiff from harassment, bullying and ostracization in order to force

Plaintiff to violate her religious beliefs and take the vaccine.

32.

Over the next thirty days, PeaceHealth issued uniform pre-approved email

correspondence to all "Undeclared / Unvaccinated Caregivers" that reminded them of the

Mandatory Vaccine Policy and the need for action before August 31, 2021. Those emails only

included reference to "Qualifying medical exemptions" with a link to the appropriate form.

33.

Likewise PeaceHealth issued numerous public announcements that "PeaceHealth will be

requiring caregivers to show proof of vaccination or submit a qualifying medical exemption on

or before August 31, 2021." No mention was made of religious objections. In all of these

communications through August 17, 2021, PeaceHealth still publicly acknowledged it could

reasonably accommodate medical exemption requests through "masking, physical distancing,

reassignment to a non-patient care setting and regular COVID-19 Testing." Again, no reference

was ever made to similar accommodations for religious based exemptions.

34.

During the first two weeks of August 2021, PeaceHealth successfully achieved its initial goals of targeting religious objectors with its new Mandatory Vaccine Policy through harassing and demeaning public statements and intentionally interfering with her right to assert a religious objection by not acknowledging it as an option. Furthermore, during this time period, PeaceHealth intentionally identified and segregated medical objectors through a separate accommodation process with their own forms, allowing PeaceHealth to afford them special treatment as further alleged below.

35.

On August 18, 2021, PeaceHealth modified its Mandatory Vaccine Policy to now prohibit unvaccinated employees from working at any PeaceHealth facility under any circumstance, effectively implementing a 100% compliance policy with the sole "accommodation" being an unvaccinated worker could keep her job if it was "100% remote" (and she obtained a valid exemption).  But while PeaceHealth took the outward facing extreme policy position it could not accommodate any unvaccinated worker unless the worker was "100% remote," behind the scenes, PeaceHealth continued to discourage employees from submitting religious exemptions, orally telling employees those "are not being approved," while also making plans to quietly accommodate individuals with medical exemptions.

36.

Ms. Cramer timely submitted religious exemption requests (by email) before the August 31, 2021, deadline. A true and correct copy of the religious exemption request is attached hereto as Exhibit "A." Ms. Cramer also requested the accommodation of remotely working from home,

which had been routinely allowed for similarly situated colleagues throughout the pandemic.

37.

Shortly thereafter, Ms. Cramer received a form notification from PeaceHealth that her request for a religious exemption had been "approved" but that PeaceHealth had made the "clinical decision" that "contact between unvaccinated caregivers and patients, caregivers or other community members in our facilities poses an unacceptable health and safety risk." Several weeks (or months later), Plaintiff learned that after "careful consideration," it was determined the only "accommodation" that could be offered was indefinite unpaid administrative leave of absence. Of course, this decision had already been made before the August 31, 2021, deadline and before she submitted her religious exemption request, yet Defendant strategically feigned "careful consideration" as part of a sham "interactive process" when, in fact, there was no interactive process with Plaintiff and no "careful consideration" of available accommodations.

38.

In fact, as alleged above, Plaintiff requested an accommodation of being allowed to work from home because her job duties as a Case Manager could be performed 100% remotely from home and, in fact, had been performed from home by other Case Managers for extended periods of time with PeaceHealth's approval during the pandemic. PeaceHealth even allowed other Case Managers to work remotely after the August 31, 2021, vaccine deadline. PeaceHealth never considered Plaintiff's request for an accommodation.

39.

Despite achieving a high level of compliance with its Mandatory Vaccine Policy by August 31, 2021, PeaceHealth did not re-evaluate the policy and did not consider or offer any

other reasonable accommodations for Plaintiff that would have allowed her to remain working either remotely or at a PeaceHealth facility. Instead, PeaceHealth steadfastly refused to engage in a good faith interactive process with Plaintiff on any level and strictly enforced its policy against Plaintiff, making August 31, 2021, her last day of work at PeaceHealth before being placed on an unpaid leave of absence.

40.

Thereafter in September 2021, PeaceHealth scrambled to contact Ms. Cramer and demanded that she complete a second religious exemption request using a form provided by the Oregon Health Authority entitled "COVID-19 Vaccine Religious Exception Request Form." Defendant threatened her that if she refused to complete the new form, that it would change their "approved" exemption status to "unapproved"—despite having previously approved Plaintiff's exemption request. Plaintiff complied with Defendant's request and re-submitted her original exemption request using the requested form.

41.

PeaceHealth's "reasonable accommodation" for Ms. Cramer was to stop paying her wages and force her to use accrued PTO in place of her wages, revoke her access to the workplace including internal job search capabilities, revoke access to all electronic materials including email accounts, prevent her from working in any capacity, terminate all workplace benefits by the end of January 2022 and recommend that she apply for unemployment benefits with the State of Oregon. This, by definition, is not an "accommodation" under any conceivable definition.. To make matters worse, PeaceHealth sent regular email reminders to Plaintiff she could return to work if she violated her sincerely held religious beliefs by taking the vaccine.

42.

Defendant intentionally and in bad faith ignored reasonable accommodations of (1) allowing Plaintiff to work from home remotely, (2) masking, (3) physical distancing, (4) potential reassignment to non-patient care areas, and (5) testing, that it acknowledged were reasonable and effective accommodations since the beginning of the pandemic and continued to be reasonable accommodations throughout 2021. In addition, Defendant knew the COVID-19 vaccines did not prevent or reduce the risk of infection of COVID-19 and did not prevent or reduce the risk of transmission of COVID-19, and as such, were not effective for the stated purposes. Yet Defendant never considered this information, or any other accommodations unique to Plaintiff's position, when deciding whether to offer accommodations.

43.

Defendant's adverse employment actions against Plaintiff were not, as claimed, to protect against an "unacceptable health and safety risk." Instead, PeaceHealth intentionally discriminated against Plaintiff based on her sincerely held religious beliefs because those religious views were reprehensible to PeaceHealth and fell outside the religious views that PeaceHealth deemed to be acceptable due to significant bias and hostility towards individuals with religious objections to the COVID vaccines.

44.

The underlying pandemic conditions on August 31, 2021, were exactly the same as the conditions that PeaceHealth originally used as justification for granting reasonable accommodations for *medical exemptions* on August 3, 2021, in the form of (1) masking, (2) physical distancing, (3) potential reassignment to non-patient care areas, and (4) testing. Suddenly, by August 18, 2021,  PeaceHealth took the public position that PPE, distancing,

potential reassignment to non-patient care areas and testing posed an "unacceptable health and

safety risk" despite the fact that other hospitals in Oregon and throughout the country allowed

unvaccinated exempted caregivers to provide direct patient care and that no new scientific data

justified this decision, which was an extreme and arbitrary determination made by PeaceHealth

for reasons born of animus, not patient safety.

45.

Moreover, while PeaceHealth gave the outward appearance that its Mandatory Vaccine

Policy was facially neutral for medical and religious exemptions on August 18, 2021, in reality

PeaceHealth's conduct tells a different story. While Plaintiff summarily lost her 24 year career at

PeaceHealth on August 31, 2021, PeaceHealth quietly implemented different options for

caregivers with medical exemptions by secretly bending over backwards to assist, accommodate

and avoid that same result through the following conduct:

- Starting the week of September 3, 2021, PeaceHealth had a sudden change of heart
  about the strict enforcement of its Mandatory Vaccine Policy towards persons with
  medical exemptions. Instead of strictly forcing them out on "unpaid leave of
  absence" on August 31, 2021, suddenly PeaceHealth allowed individuals with
  medical exemptions that refused to become "Fully Vaccinated" to continue working
  at PeaceHealth until at least October 15, 2021 (an additional 6 weeks) in direct
  patient facing caregiving roles so long as they used appropriate PPE, engaged in
  social distancing and frequently tested. Despite having made the August 18, 2021,
  "clinical determination" that such work was an "unacceptable health and safety
  risk," suddenly it was justified for these individuals;

- PeaceHealth refused to allow employees to donate PTO to caregivers with approved

religious exemptions, but allowed PTO donations to caregivers with approved medical exemptions;

- After August 31, 2021, PeaceHealth gave preferential remote-work reassignments (as an accommodation) to caregivers with medical exemptions over Plaintiff who had religious exemptions;

- Employees with medical objections had their accommodation requests considered in good faith and without the same bias and hostility directed towards religious objectors. In one instance, a PeaceHealth employee contacted the Human Resources Department with both a medical and religious exemption request—she was told not to submit a religious exemption request because PeaceHealth "is not accepting those" and her only hope was to get an approved medical exemption. Thus, PeaceHealth engaged in a good faith interactive process towards employees with medical exemptions, whereas Plaintiff were not afforded any interactive process.

- PeaceHealth returned employees with medical exemptions from the vaccine to work at a faster rate than those with religious objections, such as Plaintiff. In fact, PeaceHealth refused to bring Plaintiff back to work in or after January 2022 despite pandemic conditions returning to normal levels outside of any Delta "variant spike."

46.

From September 1, 2021, through at least April 2023, PeaceHealth communicated to Ms. Cramer that she was still a PeaceHealth employee that remained on an unpaid leave of absence. During this time period, Ms. Cramer did not resign from employment and remained willing to return to work and, in April 2023, Ms. Cramer responded to an email from PeaceHealth, stating that she was interested in more information about returning to work at PeaceHealth. She has not

been contacted by PeaceHealth and was not asked to return to work.

47.

In sending these communications to Ms. Cramer that she remained an employee with a prospect of reinstatement, PeaceHealth intended to forestall Ms. Cramer from seeking full legal redress for its unlawful actions.

48.

Because of PeaceHealth's conduct, Ms. Cramer was forced to use all of her accrued paid time off, lost her PeaceHealth career of 24 years, lost her hard earned seniority, lost her benefits and wages and generally lost everything she loved about her job.

49.

Ms. Cramer seeks a jury trial for all claims that can be tried to a jury under federal law.

**FIRST CLAIM FOR RELIEF**

**(Unlawful Employment Discrimination Based on Religion in Contravention of Or. Rev. Stat. § 659A.030 and Title VII of the Civil Rights Act – 42 U.S.C. §2000e et seq —Failure to Accommodate Religious Beliefs)**

50.

Plaintiff realleges all paragraphs above as if fully set forth herein.

51.

ORS 659A.030(a) and (b) and 42 U.S.C. § 2000e-2(a)(1) each prohibit an employer from terminating employment or discriminating against an employee in the terms and conditions of employment because of a sincerely held religious belief. When the employee has a sincerely held religious belief that conflicts with an employment requirement, the employer must initiate good faith efforts to reasonably accommodate the employee's religious practices and has an affirmative obligation to reasonably accommodate the religious practices unless such accommodation would cause undue hardship.

52.

Plaintiff is a member of a protected class on the basis of her devout and sincerely held religious beliefs in the tenets of Christianity. As alleged above, Plaintiff duly notified Defendant that her sincerely held religious beliefs conflicted with Defendant's Mandatory Vaccine Policy.

53.

Defendant was aware that Plaintiff's sincerely held religious beliefs conflicted with the Defendant's Mandatory Vaccine Policy.

54.

Defendant violated ORS 659A.030(a) and (b) and 42 U.S.C. § 2000e-2(a)(1) by failing to initiate or otherwise engage good faith efforts to reasonably accommodate Plaintiff's religious beliefs and failing to reasonably accommodate those religious beliefs. In fact, no legitimate or good faith interactive process and no reasonable accommodations were in good faith considered or offered. Instead, Defendant took action that effectively avoided providing an accommodation by placing Plaintiff on indefinite "unpaid administrative leave" as the sole "accommodation" which, in fact, was no accommodation at all. Defendant engaged in a sham "religious exemption" process that was never intended to provide reasonable accommodations but was, instead, designed to generate a pretext to outright deny her request for a religious accommodation and remove her from the workplace indefinitely without having to consider or provide a reasonable accommodation.

55.

Reasonable accommodations were readily available but intentionally avoided including through (1) remote work from home, (2) masking, (3) physical distancing, (4) potential reassignment to non-patient care areas, and (5) testing, among other accommodations. None of these accommodations posed an undue burden as they were implemented for nearly two years before the imposition of the Mandatory Vaccine Policy.

56.

Defendant also violated ORS 659A.030(a) and (b) and 42 U.S.C. § 2000e-2(a)(1) by

failing to initiate good faith efforts to reasonably accommodate and failing to reasonably accommodate Plaintiff's religious beliefs after August 31, 2021, by monitoring or considering any changes in pandemic conditions or otherwise reconsidering the Mandatory Vaccine Policy and/or reconsidering the use of "unpaid administrative leave" as the sole and continuing "accommodation" for Plaintiff when, in fact, that was not an accommodation and PeaceHealth could have easily and without any undue burden brought Plaintiff back to work immediately after the fifth "Delta" wave had passed including through the use of (1) remote work from home, (2) masking, (3) physical distancing, (4) potential reassignment to non-patient care areas, and (5) testing, among other accommodations. Instead, PeaceHealth refused to take Plaintiff off "unpaid administrative leave" after a reasonable time had passed for reasons unrelated to the pandemic or the "health and safety" of others and instead was motivated by a religious bias towards Plaintiff whom Defendant considered to be immoral, reprehensible, and outside the approved religious beliefs of her corporate employer.

57.

The failure to accommodate resulted in Plaintiff's wrongful termination and was the proximate cause of Plaintiff's damages.

58.

As a proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer ongoing serious emotional distress including but not limited to physical pain and physical sickness, panic attacks, headaches, nausea, night sweats, irritability, hypervigilance, nervousness, humiliation, depression, anguish, embarrassment, fear, shock, discomfort, fatigue, sleeplessness, elevated anxiety and other physical symptoms relating to her termination in an amount to be determined at trial.

59.

As a proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages in the form of lost wages (back pay and front pay), lost bonuses, lost benefits,

damage to her reputation, out of pocket expenses and other pecuniary loss according to proof at trial.

60.

In committing the foregoing acts, Defendant has been guilty of malice or reckless indifference towards Plaintiff's rights thereby entitling Plaintiff to punitive damages in a sum appropriate to punish and make an example out of Defendant. The acts of oppression, fraud, and/or malice were engaged in by officers, directors and/or managing agents of Defendant which ratified and authorized the wrongful conduct for which an award of punitive damages is sought.

61.

Plaintiff also seeks recovery of attorneys' fees, costs and expenses.

## SECOND CLAIM FOR RELIEF

**(Unlawful Employment Discrimination Based on Religion in Contravention of Or. Rev. Stat. § 659A.030 and Title VII of the Civil Rights Act – 42 U.S.C. §2000e et seq — Disparate Treatment Discrimination)**

62.

Plaintiff realleges all paragraphs above if fully set forth herein.

63.

ORS 659A.030(a) and (b) and 42 U.S.C. § 2000e-2(a)(1) and (2) and (m) prohibits an employer from terminating employment or discriminating against an employee in the terms and conditions of employment because of a sincerely held religious belief.

64.

Plaintiff is a member of a protected class on the basis of her devout and sincerely held religious beliefs in the tenets of Christianity. Plaintiff was qualified for her position and duly and adequately performed the job duties throughout her employment with Defendant. Defendant was aware that Plaintiff's sincerely held religious beliefs conflicted with Defendant's Mandatory

Vaccine Policy.

65.

As alleged above, Plaintiff experienced adverse employment actions because of her religious beliefs that materially affected the terms and conditions of employment through Defendant's refusal to recognize religious exemption requests as legitimate, being branded as immoral, against the common good and on the fringe of society, and through the use of a pre-determined sham "reasonable accommodation" that placed her on indefinite unpaid administrative leave effective August 31, 2021.While on "unpaid administrative leave" through at least April 2023, Plaintiff continued to experience adverse employment actions as she was refused remote work (which her similarly situated colleagues had been routinely performing for extended periods during the pandemic), passed up for assignment to other remote work positions and not returned to work in a timely manner because of her religious beliefs.

66.

As alleged above, Defendant acted with religious animus towards Plaintiff through a series of intentional and deliberate acts that demeaned, belittled and ostracized Plaintiff in the workplace. Defendant branded Plaintiff as "immoral" and outside the accepted scope of Defendant's approved religious beliefs in order to force her compliance with the Mandatory Vaccine Policy. Defendant also intentionally frustrated Plaintiff's right to assert a religious objection to the Mandatory Vaccine Policy by "not advertising" it to employees, initially withholding forms for religious exemptions, not providing instructions describing the information needed, and affirmatively telling employees not to submit religious objections because they were not being accepted. Defendant also discriminated against Plaintiff through a sham "religious exemption" process that was never intended to provide reasonable accommodations but was, instead, designed to give the false appearance of an accommodation which was, in fact, a pretext for her termination.

67.

Similarly situated individuals outside Plaintiff's protected class were treated more

favorably than Plaintiff. For example, from the outset, Defendant's Mandatory Vaccine Policy recognized individuals with medical exemptions as deserving of respect and dignity, whereas Plaintiff as a religious objector was branded as an immoral and dangerous individual deserving of scorn. Defendant also identified medical exemptions as the only "qualifying exemption" recognized by Defendant. Again, this was motivated by a religious bias against religious Plaintiff whom Defendant deemed to be "immoral," harming the "common good," and contrary to the "vast majority" of religious beliefs that, in Defendant's opinion, were acceptable religious beliefs because they did not prohibit vaccination.

68.

Also, individuals with religious exemptions (like Plaintiff) were segregated from those with medical objections in order to provide more favorable treatment by: (1) allowing individuals with medical exemptions to continue working at PeaceHealth after August 31, 2021, even though they were not Fully Vaccinated in compliance with the Mandatory Vaccine Policy, (2) allowing individuals with medical exemptions to use PTO gifted by other caregivers whereas religious objectors were not allowed this benefit, (3) giving individuals with medical exemptions preferential remote work job assignments after August 31, 2021, (4) allowing case managers to work remotely from home, and (5) returning individuals with medical exemptions to work at a faster rate than individuals with religious objections.

69.

The unlawful discrimination as outlined above was a direct and proximate cause of Plaintiff's wrongful termination.

70.

As a proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer ongoing serious emotional distress including but not limited to physical pain and physical sickness, panic attacks, headaches, nausea, night sweats, irritability, hypervigilance, nervousness, humiliation, depression, anguish, embarrassment, fear, shock, discomfort, fatigue,

sleeplessness, elevated anxiety and other physical symptoms relating to her termination in an amount to be determined at trial.

71.

As a proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages in the form of lost wages (back pay and front pay), lost bonuses, lost benefits, damage to their reputations, out of pocket expenses and other pecuniary loss according to proof at trial.

72.

In committing the foregoing acts, Defendant has been guilty of malice or reckless indifference towards Plaintiff's rights thereby entitling Plaintiff to punitive damages in a sum appropriate to punish and make an example out of Defendant. The acts of oppression, fraud, and/or malice were engaged in by officers, directors and/or managing agents of Defendant which ratified and authorized the wrongful conduct for which an award of punitive damages is sought.

73.

Plaintiff also seeks recovery of attorneys' fees, costs and expenses.

**THIRD CLAIM FOR RELIEF**

**(Unlawful Discrimination in Contravention of ORS 659A.030 and Title VII of the Civil Rights Act-42 U.S.C.§2000e et seq. – Disparate Impact Discrimination)**

74.

Plaintiff realleges all paragraphs above as if fully set forth herein.

75.

On or about August 18, 2021, Defendant amended its Mandatory Vaccine Policy for the COVID-19 vaccination schedule in such a manner that, even if it was facially neutral, it had a significant disproportionate adverse effect on individuals with religious objections to the COVID-19 vaccine, including members of the Christian faith. Although Defendant knew, and

intended, that its vaccine policy effectively target Christian beliefs it deemed outside the scope of "the vast majority" of acceptable religious beliefs, even if Defendant did not know or intend such targeting, the disparate impact of its Mandatory Vaccine Policy caused disproportionate adverse impact on these individuals, including Plaintiff.

76.

The Mandatory Vaccine Policy had no material relationship to, and did not further, a legitimate workplace objective and was instead used as a pretext for discrimination against those with religious objections to the COVID-19 vaccine including Plaintiff whom Defendant designated as immoral and falling outside the approved scope of religious beliefs.

77.

As a result of Defendant's unlawful disparate impact discrimination, Plaintiff was placed on indefinite unpaid administrative leave on September 1, 2021 which continued until at least April 2023 and resulted in the loss of her job, wages, benefits and other economic loss.

78.

As a proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer ongoing serious emotional distress including but not limited to physical pain and physical sickness, panic attacks, headaches, nausea, night sweats, irritability, hypervigilance, nervousness, humiliation, depression, anguish, embarrassment, fear, shock, discomfort, fatigue, sleeplessness, elevated anxiety and other physical symptoms relating to her termination in an amount to be determined at trial.

79.

As a proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages in the form of lost wages (back pay and front pay), lost bonuses, lost benefits, damage to her reputation, out of pocket expenses and other pecuniary loss according to proof at

trial.

80.

Plaintiff also seeks recovery of attorneys' fees, costs and expenses.

**FOURTH CLAIM FOR RELIEF**

**(Hostile Work Environment Harassment in Contravention of ORS 659A.030 and Title VII of the Civil Rights Act-42 U.S.C.§2000e et seq.)**

81.

Plaintiff realleges all paragraphs above as if fully set forth herein.

82.

ORS 659A.030(a) and (b) and 42 U.S.C. § 2000e-2(a)(1) each prohibit an employer from discriminating against an employee in the terms and conditions of employment through a hostile work environment because of a sincerely held religious belief.

83.

As alleged above, Plaintiff was subjected to oral, written and physical conduct of a religious nature that was unwelcome and so severe or pervasive that it altered the conditions of employment and created a hostile and abusive working environment. As alleged above, the harassment occurred before and after Plaintiff was placed on unpaid administrative leave on September 1, 2021, as she was subject to ongoing harassment through April 2023 including through removal from the workplace, through PeaceHealth's repeated communications that she could return to work only if she violated her sincerely held religious beliefs by taking the vaccine and by PeaceHealth's fraudulent use of the accommodations process and unpaid administrative leave to cause Plaintiff to believe that she would eventually return to work at PeaceHealth when, in fact, PeaceHealth had no such intention.

84.

Defendant's harassment was intentional and approved by the highest corporate officers, directors and managing agents and consisted of intentionally isolating religious objectors through a "badge sticker" program combined with numerous and ongoing public announcements and statements intended to subject Plaintiff as a religious objector to bullying, intimidation, scorn, pressure and humiliation by labelling her as immoral, dangerous, not supportive of the common good, on the fringe of society and intentionally exposing patients and colleagues to physical harm and even death. Defendant even openly acknowledged that unvaccinated religious objectors should be the subject of a public stigma.

85.

As a result of Defendant's conduct, Plaintiff was forced to explain herself to colleagues and supervisors and openly disclose she had religious based objections to taking the vaccine. Plaintiff was then subjected to ongoing harassment, bullying and intimidation. Despite knowing this abusive conduct was occurring, Defendant ignored it hoping it would either force Plaintiff to violate her religious beliefs and become vaccinated or force her to quit. Thus, Defendant failed to exercise reasonable care in preventing the harassment and failed to take corrective measures.

86.

The effect of the conduct complained of herein has been to deprive Plaintiff of equal employment opportunity and has otherwise resulted in tangible adverse employment action and adversely affected her status as an employee because of her religious beliefs.

87.

As a proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer ongoing serious emotional distress including but not limited to physical pain and physical

sickness, panic attacks, headaches, nausea, night sweats, irritability, hypervigilance, nervousness, humiliation, depression, anguish, embarrassment, fear, shock, discomfort, fatigue, sleeplessness, elevated anxiety and other physical symptoms relating to her termination in an amount to be determined at trial.

88.

As a proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages in the form of lost wages (back pay and front pay), lost bonuses, lost benefits, damage to her reputation, out of pocket expenses and other pecuniary loss according to proof at trial.

89.

In committing the foregoing acts, Defendant has been guilty of malice or reckless indifference towards Plaintiff's rights thereby entitling Plaintiff to punitive damages in a sum appropriate to punish and make an example out of Defendant. The acts of oppression, fraud, and/or malice were engaged in by officers, directors and/or managing agents of Defendant which ratified and authorized the wrongful conduct for which an award of punitive damages is sought.

90.

Plaintiff also seek recovery of attorneys' fees, costs and expenses.

**FIFTH CLAIM FOR RELIEF**

**(Unlawful Retaliation in Contravention of ORS 659A.030 and Title VII of the Civil Rights Act-42 U.S.C.§2000e et seq. –)**

91.

Plaintiff realleges all paragraphs above as if fully set forth herein.

92.

ORS 659A.030(f) provides it is unlawful for an employer to discriminate against any of its employees because the employee has opposed any practice made an unlawful employment practice or because she has made a charge, testified, assisted, or participated in any manner in an investigation, proceeding or hearing. Likewise, 42 U.S.C. section 2000e-3(a) make it an unlawful practice for an employer to discriminate against an employee because she has opposed any unlawful employment practice under Title VII. Such legal protections include retaliatory acts taken against current and former employees.

93.

As alleged above, Plaintiff opposed Defendant's Mandatory Vaccine Policy by (1) submitting an exemption request, (2) publicly affirming to her supervisor and others that she refused the vaccine for religious reasons and believed that Defendant's attempt to force her to comply without a reasonable accommodation was a violation of her legal rights, (3) complaining that she was being harassed, intimidated and subjected to bullying based upon her religion, and (4) filing administrative charges with BOLI and the EEOC.

94.

In retaliation for opposing Defendant's unlawful practices, Defendant refused to allow Plaintiff to work remotely, refused to give Plaintiff alternative remote work assignments, revoked Plaintiff's benefits including health insurance, refused to return Plaintiff to work in a timely and reasonable manner, refused to consider any reasonable accommodations such as reassignment or non-patient facing duties on a short or long term basis, and ultimately terminated Plaintiff's employment. As alleged above, the foregoing conduct continued through at least April 2023.

95.

As a proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer ongoing serious emotional distress including but not limited to physical pain and physical sickness, panic attacks, headaches, nausea, night sweats, irritability, hypervigilance, nervousness, humiliation, depression, anguish, embarrassment, fear, shock, discomfort, fatigue, sleeplessness, elevated anxiety and other physical symptoms relating to her termination in an amount to be determined at trial.

96.

As a proximate result of Defendant's conduct, Plaintiff has suffered and will continue to suffer damages in the form of lost wages (back pay and front pay), lost bonuses, lost benefits, damage to her reputation, out of pocket expenses and other pecuniary loss according to proof at trial.

97.

In committing the foregoing acts, Defendant has been guilty of malice or reckless indifference towards Plaintiff's rights thereby entitling Plaintiff to punitive damages in a sum appropriate to punish and make an example out of Defendant. The acts of oppression, fraud, and/or malice were engaged in by officers, directors and/or managing agents of Defendant which ratified and authorized the wrongful conduct for which an award of punitive damages is sought.

98.

Plaintiff also seek recovery of attorneys' fees, costs and expenses.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendant and seek the following relief:

1. For general and statutory damages including but not limited to lost wages, back pay, front pay and lost earning capacity on each cause of action for which such damages are

available in an amount to be proven at trial.

2. For special damages on each cause of action for which such damages are available in an amount to be proven at trial;

3. For compensatory damages including but not limited to emotional distress damages on each cause of action for which such damages are available, in an amount to be proven at trial;

4. For punitive damages according to proof on each cause of action for which such damages are available;

5. For declaratory, equitable and injunctive relief as appropriate including a declaration that the rights of Plaintiff have been violated as alleged above, for reinstatement, back pay and any other equitable relief available to Plaintiff;

6. For prejudgment interest and post-judgment interest according to law;

7. For reasonable attorneys' fees incurred in this action according to law;

8. For costs of suit and expenses incurred in this action according to law;

9. For such other and further relief as the Court deems proper and just.

10. Plaintiff seeks a trial by Jury on all claims to which Plaintiff is entitled to a jury trial.


DATED this 24th day of September 2024.


CHACKEL LAW, PC

By /s/ Geoffrey C. Chackel
Geoffrey C. Chackel, OSB No. 155727
Attorney for the Plaintiff